1   **LAW OFFICE OF PETER F. PEREZ**
    **PETER F. PEREZ, ESQ.,**
2   Attorney at Law
    Pacific News Building, Suite 309
3   238 Archbishop Flores Street
    Hagåtña, Guam 96910
4   Telephone (671) 475-5055
    Facsimile (671) 477-5445
5

6   *Attorney for Defendant Davina M. Lujan*

**FILED**

DISTRICT COURT OF GUAM

APR 11 2006

**MARY L.M. MORAN**
**CLERK OF COURT**

7                  **IN THE UNITED STATES DISTRICT COURT**

8                         **FOR THE DISTRICT OF GUAM**

9   UNITED STATES OF AMERICA,          CRIMINAL CASE NO. CR02-00075

10

11            vs.
                                       **SUPPLEMENT IN AID OF MOTION FOR**
12  DAVINA M. LUJAN,                   **CONTINUANCE**

13            Defendant.

14

15          Attached as Exhibits 1-4 are transcripts of recordings by Davina Lujan of conversations

16  between herself and Attorney Howard Trapp, on January 25, 2006, February 10, 2006, March 17,

17
    2006, and March 28, 2006, showing Ms. Lujan's intention on having her guilty plea set aside, and
18
19  refuting Attorney Howard Trapp's statement to the Court on April 5, 2006 that this was only a

20  recent decision of Ms. Lujan.

21          Dated this 11th day of April, 2006.

22

23                              **LAW OFFICE OF PETER F. PEREZ**

24

25          **BY:** _____,
                              **PETER F. PEREZ,**
26                            **Attorney for Defendant Davina M. Lujan.**

27  **ORIGINAL**

28

//START 00:00

**LUJAN:**   January 25, 9:00.  Arriving at Howard Trapp's  office.  Let me turn on. . .  .Morning.  Good morning.

**TRAPP:**   Hi.  Is it bright enough for you in here?

**LUJAN:**   Yeah.  It is.  Thank you.

**TRAPP:**   Okay.  Let me just (INAUDIBLE).

**LUJAN:**   No, I think the lighting's nice.

**TRAPP:**   Yeah.  It's cozier.

**LUJAN:**   Did you have it tinted?  Or usually, how is it?  Because often times, it is a little brighter.  But I like it.

**TRAPP:**   (INAUDIBLE) I'm gonna turn this off, (INAUDIBLE).

**LUJAN:**   How are you?

23 pages, 4481 words                    1

26

27 **TRAPP:**     I'm okay.

28

29 **LUJAN:**     You've been dealing with a lot, it sounds like.

30

31 **TRAPP:**     Yes, right.  What we want to do in this case, as I understand it, is see if we

32 can get you out of the plea agreement.

33

34 **LUJAN:**     Uh-huh .

35

36 **TRAPP:**     Now, you know when I said at the last – but you're the boss.  Okay?  Now,

37 I have a plan.  All right?  And if you will work with me on my plan, it has the best chance

38 of us having success.  Okay?

39

40 **LUJAN:**     Okay.

41

42 **TRAPP:**     All right.   Now, why are we meeting this morning?  We're meeting this

43 morning, because I don't have any choice, okay?  Because the probation officer wants

44 to talk to you about your pre-sentence report, okay?

45

46 **LUJAN:**     Okay.

47

**TRAPP:** Okay. And so I have no final ideas about how we're gonna get out of this plea agreement yet. But I have a process by which I think we can address this. Okay?

**LUJAN:** I'm sorry, the probation. Because they were supposed to be meeting with me during this period, right?

**TRAPP:** I don't think so. Because I think your case is still sealed, or – or it was put off until April, because you're supposed to be cooperating. I mean, that's kind of a fiction. A legal – a legal fiction, let's put it that way. Okay? And so, they have – you haven't been reporting in to them, right?

**LUJAN:** Not at all. No contact.

**TRAPP:** Fine. Okay. Well, that's why. Okay?

**LUJAN:** Okay.

**TRAPP:** There's a kind of an ambiguity and in its result, more or less in your favor. All right? Okay. They may ask you to start reporting, but I can't imagine they'd have you report very often. You know? They might have you – they might have you fill something out once a month, and fax it to them, or something like that. Now. Hear me out, okay? There's no way that at this point, they're gonna say to the probation officer, you know, "Hey, we're not going forward with sentencing." Okay? Because there's no

| 71 | down side to it. And this is just a probation officer. They don't make decisions about |
| 72 | things like that. All right? |

73

| 74 | **LUJAN:** | Okay. |

75

| 76 | **TRAPP:** | Also, we can do – we can – we can give them all the information they |
| 77 | want. They're going to want – you know, background information. Who's your great- |
| 78 | grandmother. Things like that, okay? |

79

| 80 | **LUJAN:** | Uh-huh . |

81

| 82 | **TRAPP:** | They're going to want financial information. |

83

| 84 | **LUJAN:** | Uh-huh . |

85

| 86 | **TRAPP:** | They're going to want different – different – different sources, things—and |
| 87 | things about your background. All right? |

88

| 89 | **LUJAN:** | Uh-huh. |

90

| 91 | **TRAPP:** | Okay. |

92

| 93 | **LUJAN:** | How – am I to disclose everything just to them, or – |

94

**TRAPP:** Yes. Yes. Except, we are not going to talk about the offense of conviction. Okay? Now, why aren't we going to do that? Well, we're not gonna do it, because we don't have to. All right? Because some years ago, there was a case called The United States against Vance. V-A-N-C-E. This guy who'd brought ice in from Hawaii. He said - he told the probation officer that he didn't want to talk about the offense of conviction, although he had plead guilty. Right? He had his reasons. As I recall – well, I won't say what his reasons were, because now you know his name. I shouldn't give that away. But, he had some good reasons, okay? What I'm telling you is a matter of public record. Because – so, the probation officer said, "Well, okay. I will not give the two – like, two points off for acceptance of responsibility. Okay? Because you won't talk to me about the offense of conviction. And so I took that up to the Ninth Circuit and won it, and it got reversed. And to make a long – to kind of oversimplify it, okay? It – the Ninth Circuit said, in effect, that you don't have to go in there and wring your hands and moan and cry to the probation officer in the first place, to show acceptance of responsibility. You've shown acceptance of responsibility by going in to court, admitting enough facts necessary for the court to accept your plea. Okay?

**LUJAN:** Uh-huh .

**TRAPP:** And so – and also, you have a Fifth Amendment right not to talk to the probation officer at all, okay? We don't want to do that. All right? Because we don't want to upset the apple cart. And I'll tell you why in a second, okay? So, we're not

| 117 | gonna talk about the offense of conviction. You don't have to know much more about it |
| 118 | than that, all right? So, no downside in that sense. All right? |

| 119 | |

| 120 | **LUJAN:** So, if I'm asked, what kind of response. . .? |

| 121 | |

| 122 | **TRAPP:** Well, let me say this. They will set up an appointment. They want me to |
| 123 | get back to them today, to – to set up the appointment for fairly soon, okay? |

| 124 | |

| 125 | **LUJAN:** Okay. |

| 126 | |

| 127 | **TRAPP:** Okay? And I will be there with you. |

| 128 | |

| 129 | **LUJAN:** Okay. |

| 130 | |

| 131 | **TRAPP:** And I will explain that. And I will get them to take an oath that they're not |
| 132 | gonna ask you about it, so don't worry. |

| 133 | |

| 134 | **LUJAN:** Okay. |

| 135 | |

| 136 | **TRAPP:** Okay? I'm gonna leave you after we start the beginning of the interview. |
| 137 | After we've knocked off a certain number of things, okay? But the other things are just, |
| 138 | like, background information. I - what comes out in the pre-sentence report, it really |
| 139 | doesn't impact upon those things you're gonna get. All right? Okay. And then if they |

140  ask you anything like that, that we discussed that you're not going to discuss, you just

141  don't answer it until you call and just – you know.  But there won't be a – it's never a

142  problem.

143

144  **LUJAN:**     Okay.

145

146  **TRAPP:**     Okay.

147

148  **LUJAN:**     What's the purpose?

149

150  **TRAPP:**     The purpose of what?

151

152  **LUJAN:**     Of the – that meeting.

153

154  **TRAPP:**     The pre-sentence?  What's the purpose of the pre-sentence report?  To

155  tell the court what sentence you should get in this case.

156

157  **LUJAN:**     So actually, they – although they have – you said earlier that the parole

158  officer has – you know, I mean, they're just – they really don't have any influence on

159  anything.

160

161  **TRAPP:**     I'm not saying they don't have any influence.  What I'm saying is –

162

**LUJAN:**   In the outcome.

**TRAPP:**   No, what – no. What I'm saying is, they're not gonna have anything to do with whether or not you're able to withdraw your plea or not.

**LUJAN:**   Oh, okay.

**TRAPP:**   So, there's no – they – let me jump ahead a little bit. Okay? So you know where I'm going. Okay? It may be – now, let me say this. (CLEARS THROAT) Well, there's a bunch of things you should know at the beginning. And I can't tell you everything at once, okay? We'll just talk about that for a second, okay? So – so, we're going to do that. Okay? I'll make an appointment for you to do that. Okay? Now, because we don't want to make a decision, a final decision about withdrawing your plea, until we find out what the probation officer says about what your sentence would be. Now, that can be helpful. Okay? Now here's the reason it can be helpful. I'll explain what I'm – got here, too. (INAUDIBLE) Counsel's mischaracterization of potential sentence provided the reason for the withdrawal of plea before sentencing. Okay? So, if you got – now. I don't want you to react, because I want you to go back and think about it. I want to know – I want you to think about what possible ways we can get your plea set aside, before you and I go into the details of it. Okay? But I want to be in a position, after you've thought about it for a while, you know, to say that if it wasn't for the fact that you had ineffective assistance of council, and things that he'd told you, including      maybe      the      eventual      result.      Okay?

187 For example, let's say before you plead, I said to you, "I think the chances —that the
188 chances are very . . .much better than not, that they'll just dismiss the case when this is
189 all over." That didn't happen. I didn't represent you, and though we were just angling
190 for that I never promised you that but let's – let's say that, okay? That could very well
191 have been it. So, oh – "Oh, okay, yeah. I might as well go plea, so what have I got to
192 lose." Okay? That could have very well been ineffective assistance of counsel, which
193 might very well allow you to withdraw your plea. Okay? You see what I'm saying?

194

195 **LUJAN:**     Uh-huh .

196

197 **TRAPP:**     So, that's why any motion that I make – and – and when we first talked
198 about this, and I didn't think about it in this context, and reacting to the circumstances
199 that we're going forward with, until I got the call a few days ago from the probation
200 officer – or last week, I think it was that I called you. That this can—that the pre-
201 sentence report could definitely be helpful. Okay? Then I'll go to Jeff Strand, and I'll
202 say to him, "Okay. What are you gonna recommend?" Okay, I'll put that together,
203 together with the pre-sentence report. And the pre-sentence report that we're gonna
204 get initially does not have an actual recommendation. It would eventually, if it goes that
205 far, okay? It won't necessarily go that far. All right? But, it'll simply say, you know,
206 what you're looking at, minimums or maximums, just sort of —okay. All right. I think it's
207 very important, because – you know, in the – in the last analysis, this is what we're
208 talking about in terms of ineffective assistance of counsel. I mean, the probation report

209  – were to -- now, this is just purely hypothetical, not possible. Okay? Were to
210  recommend, or – or to say that it's possible for the court to dismiss the case, you know,
211  without prejudice or with prejudice against you, and you go – go and sin no more, so to
212  speak. Okay? Then – then I suppose you could have had effective assistance of
213  counsel. That's an extreme example that legally can't happen. Did you understanding
214  what I'm saying, right? Okay.

215

216  So, we want to do that. Now, here's what we're gonna – now, here's – so, I'm – so, the
217  – this is a bit – a bit unorthodox. But this is – this is the way we want to do this.
218  Looking at – just a second. Hold on. You caught me just in the middle of putting this
219  together. The sentencing guidelines went into effect on November 1st, 1987. Okay?
220  And I have here, it isn't published this way but because it's on disc, I can scan it and put
221  it together this way. I have every – I have a report, of every US Supreme Court and
222  every ninth circuit case - an abstract of every one of those cases having to do with
223  withdrawing plea agreements . Okay? And I don't expect you to – you know, make
224  legal decisions about this. But I want – I'm gonna give you a set of this, okay? And I
225  put it all together. All the briefs – all of the – plea bargain withdrawal cases. And they
226  also have other kinds of plea bargain cases which aren't even relevant to yours. Okay?
227  But it – but it does – it does include all of the withdrawal cases since before the
228  guidelines. With me? Okay.

229

230  **LUJAN:** Uh-huh .

231

23 pages, 4481 words                          10

232 **TRAPP:** And so, I'm gonna give you a package of things to work with, okay?

233

234 **LUJAN:** Okay.

235

236 **TRAPP:** I'm gonna give you all of that. And you can read it. You can tell by the black
237 letter thing up here, whether it even applies to you. And then read further if you need to.
238 Okay? I highlighted this one, because I became interested in it. And so, I'll give you
239 that. And I'll give you your plea agreement. I know you have a copy, but I'll give you
240 another copy of the plea agreement. This is an unredacted one. And I'm gonna give
241 you – you know, what happened when you entered your plea. Okay? And you're
242 gonna go home, and take your time. Okay? And – because it probably – it's probably
243 not politic, to do anything until we get a pre-sentence report. But nevertheless, feel free
244 to call me, and ask questions. And maybe make appointment, if you think you're really
245 on to something. Okay?

246

247 **LUJAN:** Okay.

248

249 **TRAPP:** And use your judgment. You always talk – I've always – I've never said I
250 won't talk to you. Okay? All right. And – and so, that's what you're going to do. Does
251 that sound like a plan?

252

253 **LUJAN:** Uh-huh .

254

23 pages, 4481 words                                      11

255 **TRAPP:**   Okay. All right. Now, I don't do this with every client, because a lot of my

256 clients are practically illiterate.   You understand what I'm saying, okay?   And the

257 business (INAUDIBLE). All right? But I think that – and so, if you see something here –

258 see, I can't – I can't know everything to ask you. You know? That might work with the

259 ninth circuit. What we want is something that really rings a bell with you.  If they could

260 find it and it's also, the ninth circuit case.

261

262 **LUJAN:**   Uh-huh .

263

264 **TRAPP:**   You see.  The third circuit case might be very interesting, okay?  Now.

265 Caveat.

266

267 **LUJAN:**   But that's all ninth – because obviously we're under the ninth.  But –

268

269 **TRAPP:**   If the ninth circuit says it, then this court is bound by it.  I don't care who

270 the judge is.  Okay? Now, but, for example - this – this case that I mentioned – a couple

271 of questions are up in the air.  When it says that the end-bank (?) quote is to hear a

272 case holding that the defendant knew the sentence he would receive despite mistaken

273 information – hold on just a second now.  I think that's called the Davis case here I

274 believe it's got a different name because it looks like the same case to me, okay?  The

275 ninth – the ninth circuit is considering a couple of these things, and hasn't decided them

276 yet.  So, we may not – we – we – we may very well, like, want to make our motion and

277 say to the court, "We don't even – this might be inappropriate, for you to decide the

278  motion because the case we're relying on has been vacated." Okay? In other words, it

279  doesn't legally exist any more, it can't be cited except I think I could cite it for the

280  purpose to show that it's vacated, and the court – the ninth circuit is considering. So,

281  let's wait and see what they do with it, okay? And cross our fingers, and light a candle.

282  Okay? End -bank Court (?) to consider appropriate remedies for ineffective assistance

283  during plea negotiations. Does that ring a bell? Okay.

284

285  **LUJAN:** Oh, boy.

286

287  **TRAPP:** Okay. Yeah, okay. And that, in November – let's take- they ordered an end -

288  bank hearing. (?) And that isn't resolved yet. So, there are unresolved things. So, you

289  can see this whole thing is in a flux, okay?

290

291  **LUJAN:** Uh-huh .

292

293  **TRAPP:** But the rule is, the rule is that you can withdraw your plea for any just reason.

294  Okay? I was gonna get you the (INAUDIBLE) - what we've got here. This index is

295  worthless, to tell you the truth. Okay. (INAUDIBLE) And I used to know it by heart, but I

296  don't remember. Here we go. A defendant may withdraw a plea of guilty for no – may

297  withdraw a plea of guilty before the court accepts the plea for any reason or no reason.

298  Okay? Well, I believe the court has accepted the plea, okay? Or after the court accepts

299  the plea, but before it imposes sentence. If the court – well, we don't have a type-C

300  plea agreement, so don't worry about that. If the court can – if the defendant can show

23 pages, 4481 words                      13

301  a fair and just reason for requesting the withdrawal. It's very general. I'm gonna get a

302  copy of it, and I'll highlight.

303

304  **LUJAN:**      Okay.

305

306  **TRAPP:**      . . what you're supposed to be thinking about. But, there's lots of cases

307  that have squed this. And so it's not like, you know, "Well, I don't think it's fair." The

308  judge says, "Look, I don't think it's fair." And you get to withdraw it. You know? But,

309  theoretically, you can. (PAUSE) Okay. So, I put these two tapes up in here, so you

310  can see what's cooking there. If something rings a bell, then we'll talk about it.

311

312  **LUJAN:**      Are you allowed to cite other circuit courts?

313

314  **TRAPP:**      Yes. But what we want – but we – you know, and then maybe the ninth

315  circuit might be interested, and maybe it won't. Absolutely. But they're only, like – only

316  if they're persuasive. And it's totally not binding. Okay? The only thing that's binding

317  on this ninth circuit is the US Supreme Court. The only thing that's binding on the

318  Guam Supreme Court – I tell you, you talk to any attorneys. And you – you might even

319  do it as an experiment. Talk to any attorney you meet and say, "Well, if the ninth circuit

320  says something about federal law, is it binding on the – the Supreme Court of Guam?"

321  And they'll say yes. It's not. Because we don't go to the ninth circuit for the Guam

322  Supreme Court any more. Now, let me make sure we've got everything we want here,

323  and I don't have this all mixed up. Okay?

23 pages, 4481 words                    14

324

325    **LUJAN:**    Okay. How soon for the other meeting?

326

327    **TRAPP:**    It could be pretty quick. Because –

328

329    **LUJAN:**    Okay. I've – cause I already know my schedule for next week.

330

331    **TRAPP:**    What we're gonna do – we're gonna try to make it as you sit there, okay?
332    And work it – work it out at the probation office.

333

334    **LUJAN:**    Okay.

335

336    **TRAPP:**    You guys can settle it (INAUDIBLE). Okay. (INAUDIBLE) forget about
337    that.

338

339    **LUJAN:**    Thanks.

340

341    **TRAPP:**    Okay. Now, I tell you, if this can be done, I will do it. Okay? You know, I
342    may say – I may – I might even try to discuss a few things. I might say a – just before
343    we do it, why it's a bad idea. And you tell me you want to do it anyway? Fine. Okay?
344    Because – it's just – it's just as if we were sitting here and I say, "You should plead
345    guilty." And you say, "Well, I know all the evidence is stacked against me. And you're

346 telling me I don't have a chance at trial. But I want to go to trial." Well, that's your
347 entitlement under the constitution of the United States and I respect that. Okay?
348
349 **LUJAN:** Okay.
350
351 **TRAPP:** All right? Okay. I'm not saying that necessarily is the status of the case.
352 But. Okay? And just a second now. I have – if I can find my calendar for today, see
353 who I'm talking to. I know my (INAUDIBLE). (INAUDIBLE) probation. Isn't that weird.
354 [TALKING TO THE US PROBATION OFFICE] Hi probation. . .Trapp here
355 (INAUDIBLE). Is the (INAUDIBLE) – Gil got in (?). Okay. Yes, I have Dr. Lujan here
356 and we want to set up an appointment to meet with you. How – let me say this - from
357 my point of view, the farther from today, the better cause I'm really up to my butt in
358 alligators, okay? I know I've eliminated the alliteration on that comment, but I have Dr.
359 Lujan sitting here, okay? All right. No, I don't – I – I don't think we want to kick it over,
360 okay? Not at this point. Okay? I mean, I – I told you that maybe the government and I
361 would be talking, and maybe – you know, it would go on (INAUDIBLE) or something.
362 But right now, we'll – we'll forget about it for now, okay? Some time next – can you do it
363 some time next week? Okay. So – oh, okay. So – No, that's sacred, okay? Well, let
364 me say this. You could probably give her the financial documents without me being
365 there, because you're not gonna ask – you didn't ask her anything. Okay. Now hold on
366 just a sec, okay? One reason he wants to meet soon is, they have a bunch of
367 documents for you to sign. It's for a release of information. It's financial, medical,

368 educational, things like that. We are gonna sign them. We always sign them. Cause

369 we want to cooperate. Okay?

370

371 **LUJAN:** Uh-huh .

372

373 **TRAPP:** All right. And so, if he wants to get started by giving you those so you can fill

374 them out.

375

376 **LUJAN:** Okay.

377

378 **TRAPP:** And bring them back to him. Okay?

379

380 **LUJAN:** Uh-huh .

381

382 **TRAPP:** And that will put him off for a while, so, in terms of getting (INAUDIBLE) ready.

383 So, what – when are you available this week, to go by and do that? It'll take a half-hour.

384 Now?

385

386 **LUJAN:** Now? I've got clinic at – at ten.

387

388 **TRAPP:** Okay. That's okay.

389

390 **LUJAN:** What, tomorrow's – Saturday? I mean, Friday I work eight to five. They're

391 not open on Saturdays.

392

393 **LUJAN:** Thursdays, I think I'm ten to seven. So, prior to –

394

395 **TRAPP:** How early tomorrow could you do that with her? Just a second. Would 9:00

396 tomorrow be okay with you?

397

398 **LUJAN:** Yes, for ½ hour, yes. Cause I just have to be at work by ten.

399

400 **TRAPP:** Okay. You guys are on the second floor. I'm just saying that so she'll

401 hear that. And she's gonna come by, and you're – you guys aren't gonna talk about

402 anything about the case, except to explain to her the process. And she's gonna listen,

403 and you're gonna give her the documents. She will sign the releases that you give her.

404 Okay? Because I've told her that – that we – we want to sign all of those, and be

405 cooperative. Okay? And then you're gonna have financial stuff that she's gonna have

406 to go home and fill out. Right. Okay. So, you're – okay. So, you're gonna ask her for

407 when – for her various – the various schools, maybe addresses, places that she's gone

408 to. So, you'll actually ask her that. And then ask her various places that she's resided

409 in the last few years. Right? Okay. Okay. Okay. Dr. Lujan is sitting here hearing this,

410 so she understands that. So, you know. Whether I'm there or not, we just had this

411 meeting, okay? Because she's sitting right here, and listening to us talk. Okay? She'll

412 be there at 9:00 on the second floor. Why don't you give her that stuff, and you and I

413 will talk maybe on Friday. Okay? Because it – it'll make a big difference as to what

414 happens – oh, a later meeting I have this morning, et cetera, et cetera. Okay? Let's not

415 – let's – let's – well, okay. Yeah, I – I understand. I – I understand. Okay. Can – can –

416 can we have an understanding, then, that you could ask her about her background

417 information? But you're – but you're not gonna talk in any way, shape, or form, about

418 priors because I haven't discussed it with her. I don't – I'm sure she doesn't have any.

419 Okay? And – and you're not gonna talk about drug use. I'm sure she has never – you

420 know, had a drug use thing. But nevertheless, I don't want you to talk about it with her

421 without me present. And you're not going to talk about offense of conviction. And we're

422 not gonna talk about acceptance of responsibility. That – it's – it's a non-issue, okay?

423 She's really cooperating. But you won't talk about that. So, all you're gonna talk about

424 is her family background, educational background, those things. Right? Yes. Yes.

425 Yes, okay. So, you're – you're gonna ask her about her mental and emotional health.

426 Okay. All right. Okay. ..because you have a check list. I know. I understand. Okay.

427 Okay. Okay. Yes. Okay then. Okay then. Now – now – now, just a second.

428 Because, how long is this gonna take? Because she has to – she has to start work at

429 ten. Yes. Hold on just a second. You know, if you started earlier, it would – it would be

430 easier for everybody.

431

432 **LUJAN:** Sure. Eight?

433

434 **TRAPP:** Eight o'clock? (INAUDIBLE) How about you start at eight? She'll be there.

435 That'd be fine. Okay. Okay.

436

437 **LUJAN:** Eight. Okay. So.

438

439 **TRAPP:** The second floor. It's in the – it's in the same building as the district court.

440

441 **LUJAN:** Sorry – okay. Oh, district court?

442

443 **TRAPP:** Yes.

444

445 **LUJAN:** Okay. Okay. So, just go to the second floor, and then look for probation
446 office.

447

448 **TRAPP:** When you get off the elevator there's – like, there's one hallway in front of you.
449 You can't get lost.

450

451 **LUJAN:** Okay.

452

453 **TRAPP:** Anything comes up, stop talking about it. You're uncomfortable with
454 something.

455

456 **LUJAN:** Estaban.

457

458 **TRAPP:** No, Steve. I just say Estaban.

23 pages, 4481 words                    20

459

**LUJAN:** Okay.

461

**TRAPP:** I call — I call Paul Veneer (?) "Pablo". I don't know why. It's an adaptation. Okay then? So, we have a plan. Right?

464

**LUJAN:** Okay.

466

**TRAPP:** And then you're gonna study that.

468

**LUJAN:** I am.

470

**TRAPP:** Okay.

472

**LUJAN:** Thanks so much. Take care.

474

**TRAPP:** It's my pleasure.

476

**LUJAN:** All right.

478

**TRAPP:** All right.

480

**LUJAN:** Well, good luck with the alligators.

23 pages, 4481 words

482

**TRAPP:** Yes. Okay.

483

484

**LUJAN:** Okay.

485

486

**TRAPP:** Thank you.

487

488

**LUJAN:** Bye, Celene. See you.

489

490

**CELINE:** See you.

491

492

**TRAPP:** Davina?

493

494

**LUJAN:** Yes?

495

496

**TRAPP:** Even though you saw me putting that together (INAUDIBLE), this is something
I have thought through over a period of time. And I had this stuff sitting there on my
credenza, (INAUDIBLE). And I was sticking stuff in here. So I've been putting this
together now for a couple of weeks now, since we talked last. So, this is –

497

498

499

500

501

**LUJAN:** Okay.

502

503

504  **TRAPP:** I didn't want you to think it's some (INAUDIBLE), because I said I've got some
505  other things to do. Okay?

506

507  **LUJAN:**  Okay.

508

509  **TRAPP:** Okay.

510

511  **LUJAN:**      Okay.  That was the meeting.  End 9:33, January 25th, 2006, with Howard
512  Trapp.  Thank you.

513

514  // END//

// START // 00:00

[PHONE RINGING]

**FEMALE VOICE:**     Howard Trapp Law Office, may I help you?

**LUJAN:**     Good morning, may I speak to Mr. Trapp?  It's Dr. Lujan.

**TRAPP:**     Trapp here.

**LUJAN:**  Good morning, Howard, happy Friday.

**TRAPP:**  Thank you.

**LUJAN:**  Checking in with you, just about done with everything with uh...

**TRAPP:**  Okay.  I'm going to be calling you in, okay?  But let's keep in mind and I'm going to talk to you about is the fact that when you entered into all of this, you know, they were investigating Gutierrez, they had plans for it.  Now there are a bunch of political shenanigans involving that guy by the name of Abramoff, and underhanded dealings by this guy, that's kind of being led by Russ Stoddard.  You're not able to do

that, you know? And so that's something that I'm thinking about is, you know, getting real. Okay?

**LUJAN:** Uh huh.

**TRAPP:** And so you have been frustrated in your expectations. Nobody ever promised you they would dismiss the case, on the other hand, nobody said that they wouldn't either and were kind of working towards and suddenly it's all fallen through. Okay?

**LUJAN:** Uh huh.

**TRAPP:** So we're going to be talking about that, but not today. Okay?

**LUJAN:** Alright. You know, with everything with the pre-sentencing, does that—that's not going to compromise any...

**TRAPP:** No.

**LUJAN:** ...working. Does it help?

**TRAPP:** Well, it allows us to see our options. Okay?

**LUJAN:** But we're still proceeding with...

**TRAPP:** Well, we are still looking, and like I say, we're still truly looking into withdrawing your plea.

**LUJAN:** Okay.

**TRAPP:** But if I convince myself that its spin in the first place and if I convince myself it's a really bad idea for you to do it because you're going to end up in jail for sure, I'm not going to do it, but I'm not saying one way or the other right now.

**LUJAN:** Hm. Okay, so you'll be giving me a call.

**TRAPP:** I will be, yes.

**LUJAN:** Okay.

**TRAPP:** Just a sec. Hold on, hold on, hold on. I was actually thinking about you yesterday. . .some other things. Hold on. Yes. Okay, let's look at my calendar here, some things like that. Okay. But I'm also thinking that what we—I'm also thinking, and you're not the only client that's just kind of in this position, okay, but every day that goes by, this Abramoff thing and the scandal, the Fred Black scandal - taking Fred out of there, which frankly is probably what, really what resulted in Joe leaving, is who was

kind of our friend there, more and more comes out about that. I'm watching that play out right now.

**LUJAN:** Uh huh.

**TRAPP:** There's an article—if you want to see this article, it's in the February 20th issue of *The Nation*, the magazine.

**LUJAN:** Uh huh.

**TRAPP:** And you can just log on to triple w, dot, the nation, dot, com and look at that issue or you can search for - oh, I would put Guam, I would put Black in the little search thing and it'll come right up. It's been on the Net since February the second, I believe.

**LUJAN:** Uh huh.

**TRAPP:** Take a look at that. It's interesting.

**LUJAN:** Does it look like it has an impact on my case?

**TRAPP:** Sure. Because it talks about, it talks about how the whole Gutierrez thing has been dropped because of Abramoff...

**LUJAN:** Hm.

**TRAPP:** ...and, and how in twenty-four hours, after Black was investigating over at the, over at the Superior Court, he wasn't a U.S. Attorney anymore and Lenny was...

**LUJAN:** Hm.

**TRAPP:** And how Gutierrez has met with Abramoff and Abramoff himself was lobbying back there to get Gutierrez off the hook. This is all - this is all during the time when we're supposedly cooperating in good faith...

**LUJAN:** Hm.

**TRAPP:** ...and if Curtis didn't tell you anything else, he told you he wanted you to testify about Gutierrez, right?

**LUJAN:** Uh huh.

**TRAPP:** Absolutely. So I am thinking this through, okay?

**LUJAN:** So there's that possibility then that with Gutierrez, I mean, that - that never...

**TRAPP:** Well because I would give—haven't you been disappointed in your expectations? I mean, here we were going...

**LUJAN:** Right. Well, because we were told that we would be, you know, that that's really what they ultimately wanted.

**TRAPP:** Well, frankly, this is just my opinion, that's the whole reason that they charged you in the first place, okay?

**LUJAN:** Right. Right.

**TRAPP:** But on the other hand that's probably not a good enough reason for getting out of the case in and of itself, but on the other hand, if you were told by Curtis that they were really hot to get after Gutierrez—you were told by Curtis that they were really hot—that they were really interested in you because, you say, you know what? Please, let's do what they want because you can get a really good result, okay?

**LUJAN:** Right.

**TRAPP:** And even I thought that for a long time, okay?

**LUJAN:** Uh huh.

**TRAPP:** And all the time what's going on is that there's this political machinations and that the very Justice Department that's investigating Abramoff right now was busy undoing that and they've got this guy Stoddard here saying what the attorneys shall not investigate which is B.S., okay?

**LUJAN:** Uh huh. Uh huh.

**TRAPP:** So I'm—I mean this article is the first thing that's come out that really ties Gutierrez and the whole thing together. It's very interesting.

**LUJAN:** February—which one?

**TRAPP:** It's the February 20th issue of *The Nation*. You can get it on the website.

**LUJAN:** So, it's the latest issue then?

**TRAPP:** Yeah, because it went on the stands February second. I think it's a bi-weekly. I'm not sure.

**LUJAN:** Okay.

**TRAPP:** It's a very highly reputed, super liberal magazine printed on junky paper, okay? Nobody buys it. It doesn't make any money, but it's well thought of. [LAUGHTER] It's one of those things.

**LUJAN:** Alright. I'm going to check it out. Okay.

**TRAPP:** But I'm thinking about this, okay?

**LUJAN:** Alright.

**TRAPP:** I'm—everything is kind of—everything in the practice of criminal law and defense is kind of reacting to the circumstances and what you can do with them.

**LUJAN:** Okay.

**TRAPP:** But you're going to have to not be very shy about this because the first thing we would do is unseal that - unredact let's say, that stupid plea agreement that's sitting there, okay?

**LUJAN:** Okay.

**TRAPP:** And so that the press can go ahead and see that  - and I'd kind of like to do that. I'm not going to decide for sure to do it and I will not do it without your permission, your express permission, okay?

**LUJAN:** Uh huh.

**TRAPP:** But I would like to, you know, I'd like to do it soon, okay and see what the reaction is, you know?

**LUJAN:** Uh huh.

**TRAPP:** See what the reaction is.

**LUJAN:** Okay.

**TRAPP:** And because then—because it does tie into this - because, wait a minute, you know, here's—this is really a good Gutierrez case, it's not so much a Davina Lujan case. I mean, who cares if Davina Lujan gave out some—gave out a few prescriptions to somebody. I mean, you know, stop the presses, right? You know. No. But the fact that it was the Governor using his power, you know, to put his spell on somebody to make them do something, that's something else, okay?

**LUJAN:** Uh huh.

**TRAPP:** Okay?

**LUJAN:** Okay, so let's talk about that further.

**TRAPP:** Yeah...

**LUJAN:** Okay.

**TRAPP:** ...I mean, let me say this, you know, I know what you want to do. You want to—you think you want to go to trial. Boy, is that a bad idea. I've been telling you that from the beginning. I mean, not from the very beginning, but, I mean, I've been telling you that for a long time, okay?

**LUJAN:** Well, if it could be set side something else negotiated, you know?

**TRAPP:** Yeah, well, what I would do is negotiate something else before I actually went in to set it aside. I would, you know, as a threat - it wouldn't' be posed as a threat, you know what I'm saying?

**LUJAN:** Uh huh. Uh huh. Yeah (INAUDIBLE)

**TRAPP:** But compromise with what we were doing...

**LUJAN:** Uh huh.

**TRAPP:** ...but I'd like these people to—I want these people to know that, kind of where I'm coming from. It's fairly sensitive. I can't go in there and say, "You guys are a bunch of crooks and here's what I'm going to do about it," because then they're going to have to dig their heals in, okay?

**LUJAN:** Uh huh.

**TRAPP:** It has to be done in a subtle kind of a way.

**LUJAN:** Uh huh.

**TRAPP:** I'm going to start by talking to Fred Black himself, okay?

**LUJAN:** Okay.

**TRAPP:** I'm going to get a feel for the dynamic of what's going on there. Make sure that Fred has this article.

**LUJAN:** Okay.

**TRAPP:**    But you called at a very opportune time because I was going to get a hold of you, but I wasn't going to get a hold of you today. I'm going to work on a brief which I have to have finished by now - March 3rd, okay? And, I'm up to my ass in alligators really, but that doesn't mean you're not being taken care of, okay?

**LUJAN:**    Okay.

**TRAPP:**    I've got my eye on you and on the situation and I'm trying to see what we can do that would actually be good for you and not like walking off the cliff, all right?

**LUJAN:**    Alright.

**TRAPP:**    Just because you feel like you were pushed into doing the plea . . well, there it is. There's the plea, you know, but you also testified before the grand jury, but you weren't thinking of withdrawing your plea. I mean, you said you've always wanted me to withdraw the plea, but there was this period, you know, it was a long period where you weren't trying to withdraw the plea and we weren't thinking about that. One thing I was doing, along with Fred and...

**LUJAN:**    Well, I wanted to.

**TRAPP:** ...is keeping you going in the practice of medicine, you know. As a collateral matter on the one hand, on the other hand you were cooperating. You were sticking your neck out, okay?

**LUJAN:** Uh huh.

**TRAPP:** And now you're having the rug pulled out from underneath you.

**LUJAN:** Right. Right.

**TRAPP:** I mean, at the time that you pled the U.S. Attorney's Office was probably the only governmental agency on Guam that had a good reputation, right?

**LUJAN:** Uh huh.

**TRAPP:** And now they have a shoddy reputation.

**LUJAN:** Pretty bad.

**TRAPP:** It is bad. All this stuff that's constantly coming out on the media—in the media.

**LUJAN:** Okay. Alright. So call me maybe next week?

**TRAPP:**     Yeah maybe.  I mean, [LAUGHS] I'm not being facetious when I say that, but I'm thinking it through, okay?

**LUJAN:**     Okay.  Alright.

**TRAPP:**     But on the other hand I'm not scolding you for calling me, okay?  You have to understand that, okay?

**LUJAN:**     Alright.

**TRAPP:**     Okay.  You should feel free to call me.

**LUJAN:**     Okay.

**TRAPP:**     I always take your calls, unless I'm not here or I return it right away.  All right?

**LUJAN:**     Okay.

**TRAPP:**     Okay.  But you see what I'm saying.  I'm trying to figure out something that would be a good result, not just like a—kind of a suicidal result, you know what I'm saying?

**LUJAN:** Yeah, um...

**TRAPP:** And one reason—and one reason I'd like to get through to where we actually have the pre-sentence report which we would have some time—I forget the exact day it's due but some time like the first part of March, you know.

**LUJAN:** Uh huh.

**TRAPP:** And to see where the Probation Officer is coming from, see what they make of the case and then—and then we can have something more concrete to react to, okay?

**LUJAN:** Okay.

**TRAPP:** You know.

**LUJAN:** Alright.

**TRAPP:** It's just—it gives me a tool to work with as opposed to, you know, just setting your—see if we move—the minute we move to set aside your plea...

**LUJAN:** Uh huh.

**TRAPP:** ...and it's not set aside, you'll probably lose points for acceptance of responsibility on sentencing and make it harder to get probation. Do you see what I'm saying? And we would alienate the U.S. Attorney's Office in the sense that they—that they maybe they wouldn't recommend probation and so there's a lot of different things at stake here.

**LUJAN:** Do you think that there's a possibility too though that you could, you know, present it in such a fashion that they would be amenable to making changes and negotiating something else...

**TRAPP:** You know all these different intangibles are possible. You know what I'm saying?

**LUJAN:** Uh huh.

**TRAPP:** And I can't give you a reading on what percentages of each one or something. I really am feeling my way in a situation that is kind of quickly, quickly kinda developing in different directions. Okay?

**LUJAN:** Uh huh. Okay.

**TRAPP:** You see what I'm saying?

**LUJAN:** Uh huh. Uh huh.

**TRAPP:** I mean, I mean I know you want to wrap this up and maybe the first thing we would do is maybe delay the sentencing a bit while we're working on this other thing if, you know, if there's a reason to do it, you know, a positive reason to do it, not just a..

**LUJAN:** Uh huh.

**TRAPP:** ...not just for the sake of procrastination.

**LUJAN:** Uh huh. Okay.

**TRAPP:** But you see what - I'm thinking of you because, you know, it's a problem—once you make that motion and the motion is turned down, then we're just in a jam and we've gained nothing. Do you see what I'm saying?

**LUJAN:** Uh huh.

**TRAPP:** Yeah. And then if it's granted, I don't even want to think about going to trial on this thing. I mean, I can do it. Hey, I love to try cases, you know? It gets me out of the office, you know, and it's theater in the round and it's something I'm good at and I love to do it, you know but...

**LUJAN:** Uh huh.

**TRAPP:** ...but I don't want to do it irresponsibly, okay? So that's my thoughts on it.

**LUJAN:** Okay.

**TRAPP:** But you did catch me at a good time. I was just really thinking that through last night.

**LUJAN:** Alright. Well, I'm going to check out that article. Okay?

**TRAPP:** If you have trouble finding it, let me know. I can always—I can always find it and I'm going to go print a copy right now myself.

**LUJAN:** Okay.

**TRAPP:** Okay? But you shouldn't have any problem.

**LUJAN:** Alright Howard.

**TRAPP:** Okay then.

**LUJAN:**     Okay, thank you.

**TRAPP:**     Yeah, bye bye.

**LUJAN:**     Alright.  Bye bye.

// END //

**LUJAN:** Good Morning. March 17th, St. Patrick's Day, 2006. Eight o' clock in the morning.

Off to see my attorney – and dear Lord, let there be something good to hear.


[CAR SOUNDS, PARKING, EXITING VEHICLE, STREET SOUNDS]

[INAUDIBLE]


**LUJAN:** What do you think, just in general about that…


**TRAPP:** [INAUDIBLE] We agree on that. [INAUDIBLE]


**LUJAN:** No, no, no, no.


**TRAPP:** I started to work on it and then I thought that…


**LUJAN:** Bad idea.


**TRAPP:** Bad idea, but I thought [INAUDIBLE]


**LUJAN:** I think they started getting excited about something else which has nothing to do with

me, I think. Do you agree?



**TRAPP:** Yeah, but in my opinion [INAUDIBLE]. I've seen different things and I've even talked to a guy who Washington Post with [INAUDIBLE] the breaking Abramoff story and all, you know, and that article is probably the most accurate, you know. Although I would say that it's kind of slanted in one direction and that is to say that Fred Black, I mean, it's kind of all pro we should have gotten rid of Fred Black, okay? But on the other hand, Fred Black himself probably is kind of a [INAUDIBLE] maniac in the sense that he kept focusing on this one thing, you know, maybe to the exclusion of other things. You know what I'm saying? So... You know, Fred Black (may not be?) the U.S. Attorney [INAUDIBLE] is not a bad idea, you know. [INAUDIBLE] is a good idea and then reasons also maybe bad for having gotten rid of him because they were focusing on the gang and Tony Sanchez over there. I've gotten your PSR.

[INAUDIBLE BACKGROUND CONVERSATION]

**LUJAN:** (Pre-sentencing today?)

**TRAPP:** Yeah, I'll get it [INAUDIBLE].

[MICROPHONE MUFFLED]

**TRAPP:** And then, I'll get it for you, but in the meantime, I mean, [INAUDIBLE] file the PSR with recommendation.

**LUJAN:** Did it change?

**TRAPP:** This is not the government's recommendation, okay? In the recommendation there is no condition about you turning in your DEA license, okay? In the recommendation, okay? I'm not sure - talking to Jeff Strand yesterday = that the DEA license issue is actually between you and the court, if the court is really involved in it. Do you know what I'm saying? It may be between you and the DEA. You see what I'm saying? Okay. They're recommending a ten thousand dollar fine. I'm going to look into that, okay? Make sure that that can be recommended, but they've put probation on, which they're also recommending probation on it. Let me give you this [INAUDIBLE]. Okay? If you have questions about it you can get back to me, but that's kind of the bottom line on what you have here. And three years of probation.

[BACKGROUND CONVERSATION BETWEEN ATTORNEY AND A THIRD PARTY—OUT OF THE ROOM]

**TRAPP:** I'm interested in the article in the paper today about your detox program.

**LUJAN:** Actually it's the one that, I guess, from—through who was it—the (Calvo Gym?). The youngest (Calvo?) It's right.

**TRAPP:** Where is PMC?

**LUJAN:** It's right at the base of the airport.

**TRAPP:** Okay. Who owns it?

**LUJAN:** Former GMHP Group, Frank Rosario.

**TRAPP:** Okay.

**LUJAN:** Jim Gillan [INAUDIBLE]

**TRAPP:** I see. Okay. Jim Gillan the guy with the [INAUDIBLE].

**LUJAN:** Jamal(?).

**TRAPP:** Jamal White(?). Okay. Okay.

[ATTORNEY WALKS OUT OF ROOM, RETURNS, SHUTS THE DOOR]

**LUJAN:** Is this um…

**TRAPP:** That is the updated PSR. That tells about any objections that we've made and what the probation officer did about it. The written recommendation goes to the judge.

**LUJAN:** This is the one that - did they accept all the recommendations that you had…

**TRAPP:** I only had one objection. That was accepted.

**LUJAN:** Is there - -where - there - was an application of—I thought there were two. One was, you know, a reduction.

**TRAPP:** Yeah, but that was accepted.

**LUJAN:** Oh. Okay. And then the other one was the guidelines, right? Which book to use for the...

**TRAPP:** Oh. There was no objection about that, it's just that I looked into it. I definitely agreed with them. I told them—I simply told you that you're lucky that we were able to use the older guidelines than the newer guidelines, but there was nothing to object to. He had it right. Okay, put this with your stuff. That'll just show you what the objections were.

**LUJAN:** Oh, this...

**TRAPP:** [INAUDIBLE] Okay. And the [INAUDIBLE]. Okay, let me tell you where we stand, I guess on DEA, all right? I met with Jeff Strand yesterday. I had a good meeting with him. And remember it was these people in the (Moth Island?) who were, I forget the names off hand, two people from Honolulu. The DEA came in and were doing a check around the island, kind of a routine check of prescriptions and that's how this whole case came to the surface. Apparently they...

**LUJAN:** It wasn't through Therese Hart? [INAUDIBLE]. It wasn't in the investigation.

**TRAPP:** There was no—there was no investigation, there was no investigation, you know what a bank examiner, a bank examiner just suddenly arrives, arrive to the bank and they surprise everybody, we're going to, you know, look at your books, right? The DEA does the same thing, like, in different areas like with Guam and they just simply arrived in Guam and started checking out pharmacies, I suppose and checking out to see and what they found was that a lot of—that there were a lot of prescriptions being written, not just by you and yours are not—I'm not saying that yours were a lot of prescriptions, okay? But a lot of prescriptions were being written for Percocet for Governor Gutierrez and Tommy Gutierrez and so they…

**LUJAN:** They did ask me about Tommy Gutierrez.

**TRAPP:** Yeah, well, right. That's probably why they asked you. They actually thought you were writing prescriptions for him and that got the attention of the local DEA agency and the U.S. Attorney's Office and that's how some of these prosecutions… The people who did that are from Hawaii and they're the ones that decided that, at the time you pled guilty, to let you keep your DEA license at the time. You wouldn't have had a problem with it until right now, except for the fact that your DEA license lapsed, as you recall, because you couldn't reapply for it because you hadn't been able to renew your physician's license and so—but they're the same people that, as soon as you got your physician's license, say okay, give me back the DEA license. They're the ones that are sitting on the decision right now. And I suppose what Jeff Strand has to say about it – I've got him kind of programmed on it, but he's not really pushing

one way or the other, okay? And I'm sure that they've had conversations about you and the time that's gone by. All the different things I told him before he made the inquiry and so Joe Wilson was working with him at the time and I thought to myself, "Well, okay, they're going to make the decision, now's the time to talk to Joe Wilson," and then I thought—but if he talks—because he could talk to them, okay? From where he is - and then I thought, "But if I talk to Joe Wilson, the only problem with that is that. . ."—I'm thinking, you know, still. I was looking at it last night and I thought—I'd think about it some more. And because it would be Friday morning, midnight our time, still back there and I have the number of the telephone on his desk and Joe Wilson could talk to them, but then I'm thinking - -but if that gets back to Strand and the gang here because Joe Wilson, when he left, he was pretty close to Fred still, okay? Fred Black. But you know, but like everything else in life, it's more complicated than that. Joe Wilson decided to leave because his wife wasn't able to shop at the commissary or something like that. It was kind of like the working relationship - the coming in of money and work for Stoddard and things like that. And so, two different philosophies, you know. One of the philosophies, left, okay? So I'm trying—I may talk to Joe and ask him what, in his judgment - would it be a bad idea to talk to them because he would probably—that's what I'm going to do right now because he would probably - obviously be the best one to judge that and he's be, basically, on our side, okay? As he has been right along and he kind of felt obligated to you and I know that because he told me so. I wasn't sure what I could do about it, but nevertheless he told me so. So that's where that stands.

LUJAN: You know, with the DEA, they do have full discretion. I know that.

**TRAPP:** Yeah.

**LUJAN:** And I think he mentioned that he does have insight as to [INAUDIBLE] so…

**TRAPP:** Well, he was able to pull it off before, right?

**LUJAN:** Right. But just finding out in what sort of instances the DEA, just their discretion to allow someone to continue to have that DEA which is so important to me. I can't tell you…

**TRAPP:** I understand.

**LUJAN:** …that. By knowing that then that can be shared also with Jeff Strand, you know…

**TRAPP:** If the DEA people say okay, we're cool, I mean, this office is cool with the DEA decision.

**LUJAN:** Right.

**TRAPP:** So this office is not the problem, but this office is not pushing much in our favor.

**LUJAN:** So it wasn't a good meeting with Jeff Strand yesterday?

**TRAPP:** It was a good meeting. Okay. It was a good meeting. And I can say this about Jeff Strand. I've had situations, very similar to this, and where Jeff Strand says, oh, well, but then when push actually comes to shove he kind of has delivered in my favor, to my surprise, I might say.

**LUJAN:** How so, though?

**TRAPP:** Hum?

**LUJAN:** How so? Just right there in court?

**TRAPP:** Getting back to me and in court also.

**LUJAN:** But without any indication that he's going...

**TRAPP:** Well, no real strong indications that Trapp this is what we're going to do and so I really have to be very careful that we don't alienate this office because this office doesn't care if we get probation, they don't care if you keep your DEA license. They're going to move on to something else. Do you see what I'm saying? Also, this office has a good working relationship with me and they don't like to disappoint me if it's not that big a deal.

**LUJAN:** So doesn't that mean that...

**TRAPP:** Including Jeff Strand.


**LUJAN:** Doesn't that mean then that they'll help you with what you ask?


**TRAPP:** Well, yeah. I think Jeff Strand is probably putting in a positive vibe. I don't know how else to describe it, okay? To the DEA people on this. As he's talking.


**LUJAN:** How soon do you think we'll know, one way or the other?


**TRAPP:** Maybe next week or so like that. I can't say. We don't want to be testy about it either.


**LUJAN:** Well, the date's approaching so...


**TRAPP:** Well, let me say this, the date is approaching, and it wouldn't be the worst thing in the world to go to sentencing, get all this into the judgment. The recommendation doesn't have anything about you turning in your DEA license on the conditions of your probation and sort of deal with it, you know, separately, which I think is really what we're doing because the judge, especially in light of this, which I didn't have when I saw Jeff Strand. The judge is not going to be dealing with it. Do you see what I'm saying? So, I mean, what I'm feeling on this is not like everybody's pointing to the sentencing and so, well, it's a little bit like , I mean, you went and you pled guilty. You had a court conviction, depending on how you define conviction. We went through all of that, on many meetings and everything with the licensing board and the hospital

board, privileges everything. But it was a [INAUDIBLE]. It wasn't something that the court would do. I think [INAUDIBLE] so that's why I'm trying to be a little cool about it and not actually worry about the fact that the sentencing is on a certain date. And you'll be gratified to see that there's no recommendation about that in there in the probation office (report?). So I'm going to call Joe—all of this kind of developed you know, yesterday talking to Jeff and in the afternoon, getting this at the end of the day and then I didn't want to call Joe last night at [INAUDIBLE]. I'm going to call Joe tonight. I mean, I have his home—I have his desk number.

**LUJAN:** Okay.

**TRAPP:** I don't want to talk to him right now. I mean, he's probably on his way out of the office or something. I'd rather talk to him at the beginning of his day, rather than at the end of his day, obviously. Okay? And besides he'll go home and just lost to a lower seeded basketball tournament, so [INAUDIBLE] and catch him when he comes to work on this Friday because midnight here is central time, eight o' clock there.

**LUJAN:** So hopefully he's at work tomorrow, right?

**TRAPP:** Well, yeah, hopefully he is. I mean, I know I've got the right number because I checked it out yesterday by calling it and it answers, hello, you've reached the desk of Joe Wilson and I'm not available right now, so that's his desk, okay? I've got home phone numbers for him too. I don't want to call him there. So that's what I'm going to do. [INAUDIBLE]

**LUJAN:** Now what about this file? Because I'm looking at what they say.

**TRAPP:** The range is—see by getting two levels off I get the range of the fine down but on the other hand, I tentatively checked and what they say about—the statutes they're citing is correct, what I have to check is, is the statute that you were—no matter what the information in your case is, I have to check to be sure that the statute of your offense behavior as such really falls under that subdivision of the statute or under a different one which would not provide for a higher fine. You see what I mean?

**LUJAN:** Uh huh.

**TRAPP:** Okay.

**LUJAN:** Well, the one that they decided is—because this one...

**TRAPP:** Eight forty-one, a, one.

**LUJAN:** Reflects the [INAUDIBLE] of five thousand.

**TRAPP:** Okay. That's under the basic guideline terrain, okay?

**LUJAN:** Uh huh.

**TRAPP:** But then...

**LUJAN:** Why did it change all of the sudden in the final...

**TRAPP:** I'm looking at [INAUDIBLE]this issue because under three we're looking at five hundred to five thousand, okay, because now we're six to seven, we drop down to six. It used to be eight, okay? And originally your fine range would have been five hundred and would have been one thousand to ten thousand, so it's not an issue, right? And the issue only came up, I mean, if they wanted to—if the probation officer wanted to recommend ten thousand under a defense level of eight he could have just done so because there is the table, under the draft [INAUDIBLE]PSI that you saw in the original, but now that I've got it lowered, he put me at a rate of five hundred to five thousand, so back to the drawing table, sub three, sub four, subsection C2 which is the one that incorporates the fine table, limiting the maximum fine does not apply in defendants convicted under a statute authorizing a maximum fine greater than two hundred and fifty thousand. That's [INAUDIBLE]still does not apply to you. Best case, the court may impose a fine up to a maximum authorized by the statute and here's looking at a statute that talks about four billion dollars, [INAUDIBLE], okay? But your defense conduct, I'm not sure it falls under that statute and I just have to check it out, okay? And...if it falls under the statute—falls under the part of the statute that I think it very well might fall under then [INAUDIBLE] then I think we're back to a five thousand dollar limit. So I don't have the answer for you right now.

**LUJAN:** Well, if he said, what do you think, though? What are your feelings? This is the final?

**TRAPP:** Yes.

**LUJAN:** And the…

**TRAPP:** Let me say this about the fine. If I could show that the maximum under the guidelines is five thousand, then I feel that—and the guidelines become then only advisory, you understand, it will turn out okay. The judge will pretty much follow this. There's no reason not to. If I'm right, legally, there's no reason to [not] follow the guidelines. If I'm right about that, then it'll be five thousand. If I'm not right about it, it'll be ten thousand and there's no sense in writing the judge about it.

**LUJAN:** Why would they go to the top of the range?

**TRAPP:** They haven't gone to the top of the range because the top of the range that they picked is four million dollars. On the statute.

**LUJAN:** I'm sorry because I just keep seeing an addendum and, you know, where they reflect the total, you know, level.

**TRAPP:** Well, I'm going to talk to the probation officer about that. That seems to be inconsistent, although that's not the recommendation. And it's true that the range, the range

under this section is five thousand, okay? But then he relied upon this section which says that if you're convicted under the statute authorizing a greater fine, then the court can give you a fine greater than two hundred and fifty thousand, than would otherwise be the maximum. I have to look into this. You can stare at that all you want —you're not going to be able to figure it out because it is not there

**LUJAN:** No. No.

**TRAPP:** Because it's not there, okay? The answers.

**LUJAN:** Well, you said the level of [INAUDIBLE] conduct rising to meet that statute. I mean, what conduct are they referring to?

**TRAPP:** Well, whether you fall under—there's descriptions of the kinds of [INAUDIBLE] and things. I have to look at all of that to make sure that...[INAUDIBLE]

**LUJAN:** What about this judge?

**TRAPP:** This judge.

**LUJAN:** [INAUDIBLE]...if it's not good. Appointed by Bush recently 2003.

**TRAPP:** How do you know he's not good?

**LUJAN:** Well...

**TRAPP:** The Judge—Judge Robart(?), who's leaving, today's his last day, he's appointed by Bush and he's a sweetheart.

**LUJAN:** Well this one's just new and...

**TRAPP:** Well this one is just new.

**LUJAN:** I mean, what you google on him is...

**TRAPP:** Let say this, my experience with these judges is they pretty much just go along with, you know, what's worked out.

**LUJAN:** So far this is not good news this morning, so you said your meeting was good with Jeff Strand, I mean, how was it? What was good about it?

**TRAPP:** Well, it was friendly, it was—they had no ax to grind with you, you know. They're checking on the DEA and I just thought it went well.

**LUJAN:** Versus how could it have not gone well?

**TRAPP:** Well, like he says, well, look, its in the plea agreement [INAUDIBLE] we're going to insist that she give up her DEA license. [INAUDIBLE]

**LUJAN:** What about…

**TRAPP:** [INAUDIBLE]

**LUJAN:** Remember we were talking about the terms of, okay, fine, everybody's talking about probation, but then what else, for three years?

**TRAPP:** I think that's required.

**LUJAN:** It's required? Because earlier when we were going over it at length at our last meeting, you saw how…

**TRAPP:** Let me say this, you don't want to argue about the probation, okay? And you don't want to argue about the amount of the fine, if it's legal because we want to be sure. The judge doesn't have to give you probation. He can give you six months in jail. And then supervise your release for the same amount of time or greater for probation. The max is generally less than that?

**LUJAN:** And what about—so what are—are there any other options?

**TRAPP:** For what?

**LUJAN:** For fighting this.

**TRAPP:** Fighting what?

**LUJAN:** Now what were you talking about? Where did I perjure myself? Where did I perjure myself Howard?

**TRAPP:** No you don't. I said that if you were to start saying things that were different than what you said in the plea agreement which you had affirmed under—which you had affirmed under the plea agreement, you would be saying it under oath eventually, okay?

**LUJAN:** Uh huh.

**TRAPP:** And it would be inconsistent. It would be perjury.

**LUJAN:** But that's why I said way at the beginning, you know, withdrawing the plea [INAUDIBLE].

**TRAPP:** I understand. Let me say this. There is no way I am going to take any steps on your behalf to withdraw the plea. I can't believe you're still thinking about that after the conversations we've had.

**LUJAN:** Well, I'm just looking at what's before me. Before you said it was excellent in that...

**TRAPP:** What was excellent?

**LUJAN:** The PSR, which you reviewed and you said, you know, it's excellent.

**TRAPP:** I didn't say excellent, I said it was good. I don't know, but be that as it may, right. This is it. All that has changed that we've come down by two levels.

**LUJAN:** Well, what do you think?

**TRAPP:** What?

**LUJAN:** What do you think?

**TRAPP:** What do I think?

**LUJAN:** Yeah about the outcome, I mean...remember I first came in...

**TRAPP:** Except for the DEA license which I don't know the answer to, the outcome is going to be that you're going to have a fine, I still have to look into what the constraints are on that, you're going to have a fine and you're going to get—you're going to have probation.

**LUJAN:** And a record that closes a lot of doors.

**TRAPP:** Well, obviously. There's nothing you can do about it.

**LUJAN:** There's nothing.

**TRAPP:** No.

**LUJAN:** Can I just ask you, if Joe Wilson was around would it have been different, do you think?

**TRAPP:** If—it may have—well, if Joe Wilson wanted...

**LUJAN:** Because I want...

**TRAPP:** Let me say this. The only way it would have been different is, I would have somebody who I could—who might give a push on the DA thing, that we just discussed, okay, in your favor, on the one hand if and if Gutierrez had gone to trial remember I said if he goes to trial and if he's convicted and when we get to the end of all this, then maybe they'll be in such a mood or frame of mind, they'll say, oh, this is wonderful, this has worked out great because you testified and all and then maybe I could talk to them if Fred—not just Joe Wilson, but if Fred was

still U.S. Attorney, maybe I could talk to him. I was hoping I could talk to him and discuss your case. None of that has worked out.

**LUJAN:** Last month, when we were looking at, you know, [INAUDIBLE] and I said, you know, we're looking at this pre-sentencing, you know, why don't we try, in terms of looking at the options and you had me review all those different cases...

**TRAPP:** I know, but you know, I've done it too and I'm telling you that any steps you take are going to result in a more negative result.

**LUJAN:** How so?

**TRAPP:** Well, if you move to withdraw the plea, you're obviously not accepting responsibility for what you did and you could—and it'll be denied and then the U.S. Attorney's Office is going to ask the judge to put you in jail for six months if that's the way it still works out.

**LUJAN:** I'm not happy. I'm not happy at all.

**TRAPP:** What are you going to do about it?

**LUJAN:** Pardon?

**TRAPP:** What do you want to do about it? I see you are not happy.

**LUJAN:** Well, this is, you know, this isn't my arena and, you know, talk about justice. I don't know where the justice is in here because I did and I've never denied I wrote for the Governor. I never denied I wrote for...

**TRAPP:** You created a situation yourself and it was a bad idea and you knew it at the time.

**LUJAN:** But at the same time, you know, it was for a back problem, for a back problem that's longstanding and there's a lot of people I deal with backs and, you know, those long trips and, you know Duenas wasn't around.

**TRAPP:** Well, I guess you got lied to because he was addicted to the stuff. I guess you didn't know it.

**LUJAN:** Is that who (?) wrote those prescriptions to?

**TRAPP:** Sure. That's my understanding. No one's told me in so many words. But that's my understanding.

**LUJAN:** The Governor or Tommy?

**TRAPP:** The Governor and/or Tommy. Yeah.

**LUJAN:** Um.

**TRAPP:** Because that's what they were saying on this investigation, I mean, that's—they weren't seeing a lot of different people, getting a lot of different drugs from a lot of different physicians. Things they shouldn't have done. [INAUDIBLE]

**LUJAN:** So the whole thing didn't come to light because Therese Hart(?) said I wrote...

**TRAPP:** No, the whole thing came to light after they—after they—the whole thing came to light after they found these prescriptions and this pattern of the two Gutierrez's getting all these prescriptions and then I guess they investigated further.

**LUJAN:** Okay, because when I read that, the original PSI, I was surprised that Teresa said I just popped in there and got, you know, that she asked for the Governor because except for B.J. I did not write prescriptions, although I've written prescriptions for Percocet for them to give to the Governor. I mean she was, like I told you, she was, I don't know what she looks like now, a huge person. Fell and couldn't walk with her knee. And then with Lisa that was a different situation where I dealt with her directly, nurse, nursery, migraine headaches, not able to, you know, function and we needed her. Now with Gil, when I read this pre-sentence and, you know, that he called and, you know, Terese(?), I mean, that's people speculating. It's just like, no, I never wrote drugs for Gil. You know, Gil just had so many girlfriends and, you know, he had, why did he have possibly...

**TRAPP:** Do yourself a favor.

**LUJAN:** What is that?

**TRAPP:** Tell yourself, this is the situation, this is today, you know. March 17, 2006. This is the situation.

**LUJAN:** I hung in there.

**TRAPP:** A mistake was made.

**LUJAN:** I hung in there.

**TRAPP:** You have to suck it up. I don't know what else to tell you to do.

**LUJAN:** Well, I hung in there, you know, through this because of—there was clearly a desired outcome, that, you know, we were very, that over and over and that's why I said let's withdraw this, you know. )God is dependent on...?)

**TRAPP:** I've never told you that you could withdraw it. No, you don't just go in and say, I want to withdraw.

**LUJAN:** No, no, no, but way in the beginning with the...

**TRAPP:** I understand that. And that was one of the things we were looking at as we went along and I...

**LUJAN:** And you found that there was no reason...

**TRAPP:** [It's a victim case?]

**LUJAN:** There was no event, no basis, like ineffective counsel at all.

**TRAPP:** I can't say that Curtis is ineffective counsel. It was wrong—a bad idea to plea.

**LUJAN:** Never in terms of grounds too...

**TRAPP:** I might have handled it a different way, but that's not the kind of thing that's ineffective counsel. No. Ineffective counsel has to do with a standard for practice in the community. It's kind of like medical malpractice, you know. And standard of community and it's not an average standard, it's not a high standard, it's not a low standard. That's (how it works?)

**LUJAN:** So you'll speak to Joe about the DEA?

**TRAPP:** I will tonight.

**LUJAN:** Okay. Do you mind, just because it's the weekend, is there a possibility I could, you know, you could give me a call?

**TRAPP:** I'd be happy to give you a call.

**LUJAN:** You know.

**TRAPP:** What I will do is—I know we have all your numbers, but the one I call you at home, the one to take messages, give me that number right now, just put it over there and I'll take it home with me.

**LUJAN:** Six, three, two, one, four, four, seven.

**TRAPP:** Okay.

**LUJAN:** Because I'm actually—well, I work tomorrow, right? This is just—it would give me some peace to just get an idea that DEA. I mean, if there's anything good that can come out of this, besides that reduction of fine, I mean, things are not good for me there, I mean, the DEA because it's–I mean, I've had to work really hard at PMC because they're—they just lost a lot of doctors and so I'm trying to put the clinic back together for them.

**TRAPP:** Uh huh.

**LUJAN:** And so as the only doctor I do worker's comp and we'll dealing with really pretty bad injuries, I won't be able to—yeah, that DEA is just very…

**TRAPP:** I understand that. I made that very clear.

**LUJAN:** Um. And remember we were—any chance for a continuance?

**TRAPP:** I can't think what the grounds would be.

**LUJAN:** What kind of grounds could…

**TRAPP:** I mean, there'd be no basis for it beyond that.

**LUJAN:** Why did you want a continuance, you know, like they looked into a couple of months.

**TRAPP:** Well, I mean…

**LUJAN:** I mean, you know, once I saw that I said, oh…

**TRAPP:** Let me say this, if DEA comes back and says, yes, we don't want to continue, I mean, you're okay, we don't want to continue. If they say, no, but I can't think of a basis for a continuance. If they say, we have to look into it further or something, we'll check it out, we'd

like to wait until for our next visit to Guam or something, then obviously a continuance, okay? But right now, it wouldn't be too wise. Right now I don't think it's a good idea if you have a continuance unless we have a positive reason, something good can come out, then yeah.

**LUJAN:** Okay.

**TRAPP:** Because the sooner you get this behind you, one way or the other, the better off you're going to be mentally, I think.

**LUJAN:** You're not just trying to get rid of this case that's been...

**TRAPP:** Get rid of it? It's been dragging on forever.

**LUJAN:** Well, you know what I mean? Yeah.

**TRAPP:** Yeah, okay.

**LUJAN:** I was just curious. Why would you want—why, if there was any assistance that we could have gotten from DC would it have been helpful for somebody to take a look in here and...

**TRAPP:** And what? What would be our basis for it?

**LUJAN:** No, remember...

**TRAPP:** I know what you're saying...

**LUJAN:** ...because what can they do?  And you said, what they can do is they can have somebody come out here, take a look at this and, you know, continue...

**TRAPP:** But what's our complaint?  Our only complaint is that we think, okay, and we're not DEA, for example and, okay, we're not the Justice Department, but we think, our best guess is, is that if they had come across this and it in no way had anything to do with the Gutierrez investigation and expected prosecution, they probably would have called you in, worked out something with you, you know, and whatever they do, a probation kind of thing or whatever they would have done, it would have been handled administratively, you and I would never have then met, okay?  That's what I think.  That's the only thing that I think that is about this case that troubles me in terms of the prosecution.  And I don't—I don't see that going anyplace in terms of an investigation.  It's not—I mean, I don't have any—the minute they get the word here that they're looking into—the minute they get an inquiry from Justice in D.C. about your case, Jeff Strand is going to say, crap, what the hell is going on, you know, I thought we were, kind of, we understand there's some probation, whatever.

**LUJAN:** They would be more inclined to ..

**TRAPP:** To react to that.  In the local office.  And nothing good is going to come of an investigation, I don't think and I really think it's a bad idea.  I don't think you're making the

inquiry of Madeleine(?) was a bad idea, you know what I'm saying? There's an irony involved too, you know, Madeline, I don't know how to pass on what she does or doesn't do, the irony is this all rises up in an investigation of a Governor in Guam because of those two victims. [INAUDIBLE] corruption [INAUDIBLE].

**LUJAN:** Shred that letter please.

**TRAPP:** What's that?

**LUJAN:** You can shred that letter.

**TRAPP:** Well, yeah. I'm not going to shred it, but I'll going to stick it in the file.

**LUJAN:** You're going to keep it?

**TRAPP:** Well, you want me to shred it, okay I'll shred.

**LUJAN:** No, I mean, it just is—it was, you know, in a state of crazy, you know, I don't know they just got a little bit excited because of what their excitement over there, but that has nothing to do with me, you know, at all. I mean, not—I think it was going to be used in some other fashion, don't you?

**TRAPP:** Once again, in politics everything is used in a fashion. It's the same thing we're complaining about. Your mistesis(?), whatever you want to call it, you know, is being used for the Gutierrez case.

**LUJAN:** Yeah, I know. I'm being used. Okay. I have a funeral I need to go to. You know Tommy?

**TRAPP:** I'm sorry?

**LUJAN:** You know Tommy Okada?

**TRAPP:** Yes.

**LUJAN:** Yeah, it's his funeral today, so I have to spend some time with the family.

**TRAPP:** You got wound up in this whole political thing. I know why you did it. I mean, you were born into the political thing.

**LUJAN:** Presidential pardon. Is there—is that a possibility? You didn't mention that as an option.

**TRAPP:** Well, legally it's a possibility. I mean, as a local case, no. Since it's a federal case.

**LUJAN:** Right and so it's the President, right?

**TRAPP:** Yes.

**LUJAN:** How do you get a presidential pardon?

**TRAPP:** There are procedures, forms to fill out.

**LUJAN:** Really? Okay. Can—does it have to—it can be any president sitting and in the future?

**TRAPP:** Any president sitting 30 years from now.

**LUJAN:** Okay.

**TRAPP:** Presidential pardons are sometimes given because somebody, you know, did something and it's not a mistake, or brought up by the prosecution or anything and they live an exemplary life and in ten or whatever years or something, you know, and then they decide, you know, to get a pardon. I mean, let me say this, there is no legal—there is no legal grounds for a presidential pardon. The president can do it just because he pulled your name out of a hat, let's say, or something like that, you know. He can just do it. I had one guy that did the same thing. The (Governor Gutierrez before he got out of office pardoned somebody A client of mine. Great. My client. Good job, you know. It's terrible some of the pardons.

**LUJAN:** So is there going to be a problem—did you ask if there's going to be a problem for me just to, you know, right after, I mean, I couldn't go to work the next day.

**TRAPP:** No, I haven't asked. I'll just bring it up with the judge at the time.

**LUJAN:** Pardon?

**TRAPP:** I'll just bring it up with the judge at the time. I might give Jeff a head's up. Here's what the Jeff has told me he says, as far as we're concerned, you know, anything you want to say in court, we're initially talking about, is he going to recommend probation, okay? And the way he kind of put it was, oh, yeah, he says to me, we're going to recommend probation because he says when it's zero to six we invariably recommend probation unless it's an unusual case and he says, anything I tell the judge, we're not going to argue with it. That's kind of what he said. But I'm not going to bring that up with him until like the day before the sentence. I [don't] want him sitting there stewing or having at the back of the mind that somebody said something a week ahead of time that rings a bell or something like that.

**LUJAN:** The fine—I mean, I'm digging myself out of the hole and then...

**TRAPP:** If you want to write a letter...

**LUJAN:** Yeah.

**TRAPP:** ...but it can't be a letter justifying what you did, okay? It can't be this kind of a letter, okay? Alright? IF you want to write to the judge, I think you should do it. You might even mention the fine.

**LUJAN:** What about other people?

**TRAPP:** Other people is fine.

**LUJAN:** I mean is that helpful to have other people with letters?

**TRAPP:** Very helpful.

**LUJAN:** Very helpful?

**TRAPP:** Except I don't quite know what we're helping to get done here because the judge, unless we just talk about the fifty, five and ten thousand dollars, which can be part of your letter, but I don't see that being part of other people's letters.

**LUJAN:** Well, just that, you know, I'm not a drug giving doctor, I'm a doctor...

**TRAPP:** I don't think anybody is suggesting you are. If you were, they wouldn't be recommending probation. You have...let me give you something.

[ATTORNEY STEPS OUT OF ROOM]

[MICROPHONE MUFFLED]


**TRAPP:** I've got information here.

[RINGING PHONE]

[CONVERSATION OCCURRING IN BACKGROUND—CLIENT NOT INVOLVED]


**TRAPP:** I'm really pleased with that article in the paper today. I'm probably going to get it to the judge before sentencing. I mean, don't—you see the irony there. Detoxing people. I mean, seriously. I'm not being facetious.


**LUJAN:** [LAUGHS]


**TRAPP:** But you see what I'm saying, right?


**LUJAN:** Oh, God.


**TRAPP:** No it's a good thing.


**LUJAN:** Oh.


**TRAPP:** I mean, I'm not going to come right out and say it in so many words, but I mean, there you are, you have this program for people.

**LUJAN:** Don't let it be mislead though, don't let it be mislead.

**TRAPP:** That's the form for the letter for you to look—you notice there's a reference at the top of the letter and I'd like to see that on the letter because the worst thing that can happen is people have gone out and gotten letters and they send them straight to the judge without me, without them even passing me, so anybody can have—make sure the person understands that you are going to submit to me and I will submit it to the judge and I will approve or disapprove it. Amongst other things, I want the original to be stamped and seen by the Probation Office and seen by the U.S. Attorney's Office, so I also want to see what they're saying. Some people say weird things, but what we don't want, is we don't want every politician in town. Do you know what I'm saying? Because politicians will write you a letter for votes, you know, and judges are not impressed with things like that. Do you go to church? Okay. If you don't, would you have a parish priest write you a letter, people like that. Other than...

**LUJAN:** No, I mean, people have been asking. People have been asking.

**TRAPP:** [INAUDIBLE] If it's a local mayor, forget about it. You know what I'm saying?

**LUJAN:** Okay.

**TRAPP:** Those are kind of like, yeah, yeah, yeah, you know, and the court [INAUDIBLE] in a second. You start working on that, but I'd like to say, they have to know what's happening, what you're being...

**LUJAN:** Oh, no they're—I mean, everybody already knows.

**TRAPP:** But that's the point, okay?

**LUJAN:** Okay.

**TRAPP:** And you can't go making excuses to them, you don't have to say things. You don't have to say mea culpa you know but on the other hand, tell them something, you know, to make them think the case is different than [INAUDIBLE] on its face.

**LUJAN:** On its face? What do you mean by that?

**TRAPP:** Oh, on its face. You describe [INAUDIBLE].
[MUFFLED MICROPHONE]

**LUJAN:** [INAUDIBLE]...wrote a letter to me and said they wanted to get it to the judge, the judge and if you're going to give Dr. Lujan a sentence, let the sentence be that she's only allowed to practice in Guam.

**TRAPP:** Let me say, in the first place you don't want them to be politicians. You know, people who just can't tell you no, right? They have their employees, you got people who work under you who could write the letter. [INAUDIBLE] It's like a character witness, except they don't go up on the stand. [INAUDIBLE] The judge will read them though, okay? It has two assets, one what they say and how sincere they are and number two, and most importantly that they went to the trouble to do it. [INAUDIBLE] Took the trouble to go to bat for you. [INAUDIBLE] ...character witnesses...I've seen letters that will say, this is a bum rap, you know, defendant so and so is just simply not guilty so you shouldn't...you know what I'm saying.

**LUJAN:** Right.

[MICROPHONE MUFFLED]

**TRAPP:** I understand, but also if I can't get through I will also call and/or leave a message, okay? You could access from here.

**LUJAN:** Okay.

[MICROPHONE MUFFLED]

**TRAPP:** You've got the letters. You've got those three documents.

**LUJAN:** Uh huh.

**TRAPP:** You tucked all that away, right?

**LUJAN:** Yeah, yeah.

**TRAPP:** Okay and you've got that and my objections, right?

# # # END # # #

1   **28Mar06 7:30AM Transcript**
2   **Telephone conversation between Davina Lujan and Howard Trapp**
3   Duration: 14min31sec
4
5

6   //START 00:00

7

8   **LUJAN:**            March 28th about 7:30 in the morning, I'll be calling Howard

9   Trapp to request continuance of my sentencing to my new legal counsel.  I'll be

10  calling 477- 9207.  [Poses question to third party in the room] Are you sure it's

11  recording?

12

13  **THIRD PARTY:**     Yeah it's recording.   See that?   The bars. . .the numbers

14  move.

15

16  **THIRD PARTY:**     You're gonna to do great.

17

18  [pager beeps in the background]

19

20  **THIRD PARTY:**     What number are you dialing?

21

22  [DIALING]

23

24  **LUJAN:**            477-9207

25

1

DEFENDANT'S EXHIBIT

**LUJAN:** [whispering] Okay. Stay with me. Can you get my pager? it's in my purse.

**LUJAN:** Lissa, what's wrong with the phone? What's wrong with the phone? Is it plugged in . . .because I'm not even getting a dial tone. How about the wall? The wall? Should I call him on his cell phone?

**THIRD PARTY:** No. Just call him on that phone. See what he has to say.

[DIALING]

[inaudible whispers]

**TRAPP:** Trapp here.

**LUJAN:** Hey, good morning it's Davina.

**TRAPP:** Yeah.

**LUJAN:** Sorry I was a bit indisposed when you called earlier.

2

**TRAPP:** Yep. That's okay. [beeps in background] Okay. Let me just. . .a lot has been happening, okay? I got the word on late Friday afternoon that DEA says that you have to turn in your license.

**LUJAN:** Okay.

**TRAPP:** However. . . you got a second?

**LUJAN:** Yes I do.

**TRAPP:** The way that it happened was I. . .we usually close at 4 on Friday okay but if something has to be done between 4 and 5 then I'm just going to jump on the weekend even if nothing is cooking. Got a call. . .I didn't get a call from Russ. . from Jeff Strand. I got a call by a guy by the name of Grey. Do you know who Grey is? Grey is a . . .well, he doesn't call himself this but he's a *secretriz*. . .Jeff Strand's secretary. . .male, okay?

**LUJAN:** Uh huh.

**TRAPP:** And Grey said that Jeff asked him to call me and say that, uh, they had asked them to. . .and that the DEA had said that you would have to turn in your license. Grey doesn't know any details. He's just the messenger, right. . .

3

70    **LUJAN:**    Okay.

71

72    **TRAPP:**    Because Jeff Strand had just left the office and he's going to South
73    Carolina for some kind of meeting or something for a week.  Jeff Strand is not
74    here.

75

76    **LUJAN:**    Okay

77

78    **TRAPP:**    I mean, between you and I. . .I mean. . . he's a coward.  He couldn't
79    even phone me up himself and even tell me in two seconds on his way out the
80    office, right?

81

82    **LUJAN:**    Uh huh.

83

84    4:31

85

86    **TRAPP:**    And he can't face me on it, okay. . . and has his secretary call me
87    and disappears.  Okay, the bad news of course is what the DEA said, right?

88

89    **LUJAN:**    Okay.

90

91    **TRAPP:**    But the good news is that Jeff Strand is not here because it unties
92    my hands a bit.  If Jeff Strand is here, you know, I really have to deal with him,

4

93  you know, as opposed to options, you know. . I can't very well be giving him an

94  end run of things if he's just right there, I would have to talk to him and see

95  what's going on and something like that. But the problem with Jeff Strand is. . is

96  not that he's out to get you. . .he's probably not out to get anybody. He's kind of

97  lazy and he's apathetic. I mean he doesn't really care that much personally

98  whether you have to turn in your license or not. He doesn't feel like he owns

99  anybody anything or whatever. . . it's just kind of like, you know, "Okay turn in

100 your license and moving onto the next project." Right?

101

102 **LUJAN:**   Uh huh.

103

104 **TRAPP:**   Okay. So what I did was. . .um. . .uh. . . I didn't phone you to tell

105 you because, you know, why have you mulling that over over the weekend when

106 it's not necessary. There's nothing I can do on the weekend, alright?

107

108 **LUJAN:**   Uh huh.

109

110 **TRAPP:**   So I phoned you first thing yesterday morning. I don't know if you. .

111 .did you get the message?

112

113 **LUJAN:**   I was out all day.

114

5

| | | |
|---|---|---|
| 115 | **TRAPP:** | Okay, that's what I figured. It was your day off, right? Yeah. . |
| 116 | | .okay. |

117

| | | |
|---|---|---|
| 118 | **LUJAN:** | Uh huh. |

119

120   5:32

121

| | | |
|---|---|---|
| 122 | **TRAPP:** | So I went over. . .late afternoon when there wasn't anything |

123   pressing that I had to run off to do in court. I had a long talk with Fred Black. . .

124   just to talk about it, you know? Just to kind of get a feeling for things. . .alright. .

125   .and it was useful. I mean it gives me more insights into Jeff Strand, the way the

126   office works and all, and it gives me someone to talk to, you know? But Fred

127   Black can't do anything. Um. ..by the way. . .in the mean time I've also

128   ascertained through channels that Vince Duenas who dispensed a whole lot

129   more of this stuff, I mean infinitely more of this stuff to the Guiterrezes both

130   Tommy and Carl than you ever did, okay.

131

| | | |
|---|---|---|
| 132 | **LUJAN:** | Uh huh. |

133

| | | |
|---|---|---|
| 134 | **TRAPP:** | In other words, what you dispensed on the face of it was probably a |

135   correct amount for a given problem and the only way it becomes a problem is

136   that Carl was working the medical profession generally.   He would get some

137   from you and at the same time from others and it added up to, you know,

6

138  unconscionable amounts. Be that as it may, Vince Duenas had to give up his

139  license. I don't know whether he has his back or not. I just don't know.

140

141  **LUJAN:**  Uh huh.

142

143  **TRAPP:**  But, uh, John Ray and people like that in his clinic are having to

144  write those prescriptions for him, okay.

145

146  **LUJAN:**  Uh huh.

147

148  7:00

149

150  **TRAPP:**  Okay, getting back on track here. . .okay . . so since mulling over

151  what to do. . .Fred kind of says, "Well, you know, this really doesn't have to be

152  disposed at the time of the sentencing and in spite of what the plea agreement

153  says he agrees with me that the plea agreement obligates the US Attorney's

154  Office to tell the DEA about your substantial assistance and make sure that the

155  decision is made against that background. I don't know that that's been done. I

156  don't know that anything has been done except an inquiry. I don't know what Jeff

157  Strand has done. Maybe Jeff Strand went to bat for you, maybe he didn't. I have

158  way of knowing but I know that generally speaking he is apathetic. Okay. .  So

159  the next step that I started to do is to get a hold of Joe Wilson. I didn't do it last

160  night because I have to phone him at midnight and hope he gets in at 8:00

7

161  o'clock because that's midnight our time and then frankly I'm a little fuzzy by

162  then. So I phoned him up at about. . going on 5 o'clock this morning . . . caught

163  him.

164

165  **LUJAN:**     Uh huh.

166

167  8:05

168

169  **TRAPP:**     And Joe and I had a long, long talk, okay? And Joe. . .Joe has a

170  dilemma. Joe really wants to help you. I mean if Joe could wave his magic wand

171  and do this for you he would do it just because he feels obligated to me for this

172  and a number of things, you know what I'm saying.

173

174  **LUJAN:**     Uh huh.

175

176  **TRAPP:**     And so there's no problem with motivating Joe. It's just what is Joe

177  going to do, and if he does something would it do more harm than good. So we

178  talked a long time. So here's the plan. . .Joe finally decided. . . . I mean Joe has

179  no hesitation about doing something. His only hesitation is . . .does it make any

180  sense to do it and can he do it? Okay? He is not a part of this office here, so he

181  has no authority in the matter, alright?

182

183  **LUJAN:**     Uh huh.

8

184

185   **TRAPP:**   Um. . .what he does have. . . is he's the one who worked with me
186 therefore worked with you on the substantial assistance. I'm the one that sat in
187 the little room staring at the wall while you were testifying before the grand jury
188 and all that. He knows all that because he lived it, okay?

189

190   **LUJAN:**   Uh huh.

191

192   **TRAPP:**   And he also . . he also volunteered his reaction that you did
193 wonderfully well and it was very helpful and he was just totally satisfied with what
194 you had done for them and there was never anything more for you to do because
195 they've never proceeded with the Gutierrez matter because that was a grand jury
196 hearing with a view to . . and eventually indicting Carl for any of a number of
197 things including this. Okay? So Jeff is back in South Carolina. Joe knows how to
198 get a hold of Jeff. I mean, he can just make inquiries and it's all the federal
199 government. Joe is going to talk to Jeff and he is going to use his best judgment
200 on how to do that. . .uh. . . his. . .my excuse for talking to him is going to be that,
201 you know, that Jeff left and I called Joe . . and not asking Joe to do anything in
202 particular but just, you know, what can we do. Joe's saying, "Well, look at. . . I'll
203 talk to Jeff and see what I can do." And so he's going to do that, okay? But in the
204 meantime I 'm going to fax him the plea. I'm going to fax Joe through his night
205 because 8 o'clock our time he goes home basically. 8:00 o'clock in the morning
206 our time I'm going to fax him the timeline on your license and the DEA license

9

207 and the renewal in October etcetera. I'm going to fax him your certificates and
208 I'm going to fax him the plea agreement so he can have it at hand and he can
209 see the obligation that the US Attorney's Office has and he had when he was
210 here. So. .. I'm not giving up on this. I've got Joe working on it. I . . I just don't
211 know how this is going to play out because Jeff A) may resent it B) Jeff may
212 think, "Well, good, I really want to do this because I don't want to look Howard in
213 the eye and tell him, 'No.'" And he might simply say to Joe, "Go ahead and talk to
214 the DEA." Because Joe knows them. Joe worked with them on this case, you
215 see?

216

217 **LUJAN:** Uh huh.

218

219 **TRAPP:** And I don't know if Jeff ever really did talk to them before. So that's
220 where it stands.

221

222 **LUJAN:** Sounds horrible. It sounds absolutely horrible. Well. . .Howard this
223 is what I'm going to do. I'm going to ask if you would just go ahead and submit a
224 request to the District Court or the U.S. Attorney however it works to continue my
225 sentencing date and with the. . um.. . I'm just going have to seek new legal
226 counsel.

227

228 **TRAPP:** Well, you should seek new legal counsel first then and have them
229 make the request. That would be the only basis. . .that would be the only. . .

10

230

231  **LUJAN:**      I don't. . .but I'm gonna have to look.  So, the sentencing date is

232  only next week.

233

234  **TRAPP:**      Next Wednesday.

235

236  **LUJAN:**      Yes.  Next Wednesday and so I'm asking if you would submit that

237  request for continuance on my behalf, you know, while I seek new legal counsel.

238  I don't have new legal counsel, but I'm going to seek new legal counsel

239

240  **TRAPP:**      Why don't you, well. . why don't you do the seeking today because

241  it would be worth much. . .Jeff isn't even here to sort of address the motion.  Who

242  is going even address it?

243

244  **LUJAN:**      Isn't there somebody that covers for him when he's gone?

245

246  **TRAPP:**      Well. . . but they're not. . .they're going to just oppose it.  If you

247  have new legal counsel it's easier, right?  Right now, we don't really have a basis

248  for it.

249

250  **LUJAN:**      So, they don't. . .you have to provide to the Court. . .I mean, that's

251  not good enough. . .to request that, you know?

252

253    **TRAPP:**    You should seek counsel and have them confer with me

254

255    **LUJAN:**    Okay so you can't just do that?

256

257    **TRAPP:**    Well, I can but it's just going to get turned down because I tell you

258    that the court. . .like Manibusan is not continuing these things at the last minute.

259    You know, I suggested this to you some time ago and I never guaranteed to you

260    that you were going to keep you license or anything else. . .and uh. . and. . .so. . .

261

262    **LUJAN:**    But just simply asking [Trapp talking over] they're going to turn it

263    down?

264

265    **TRAPP:**    They're going to turn. . they're going to. . .If you have new legal

266    counsel making the application with a substitution, so that it's real, it might very

267    well be done so you should do that in the next day or two.

268

269    **LUJAN:**    Okay, but other than that. . .

270

271    **TRAPP:**    Other than that it's not going to work.

272

273    **LUJAN:**    I see.  Then that's what I'll do. Alright, well I'm just going to proceed

274    on.  So many things out of everybody's control.  Okay.

275

| 276 | **TRAPP:** | Do you want. . . |

| 277 | | |

| 278 | **LUJAN:** | Alright, I'm going to . . .I'm going to go ahead then. . .um. . .and you |
| 279 | | know. . . try to find somebody if that's what it takes in order to get a continuance |
| 280 | | on that, okay? |

| 281 | | |

| 282 | **TRAPP:** | Okay then. |

| 283 | | |

| 284 | **LUJAN:** | Alright.  Thank you. |

| 285 | | |

| 286 | **TRAPP:** | Okay, bye-bye. |

| 287 | | |

| 288 | **LUJAN:** | Bye. |

289

290

291 //END

292
293